CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 2 3 2012

JULIA C. DUDLEY, CLERK
BY: /s/
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DENNIS WHITE, et al., ) | |
| ) | Civil Action No. 7:10CV00467 |
| Plaintiffs, ) | |
| ) | **MEMORANDUM OPINION** |
| v. ) | |
| ) | By: Hon. Glen E. Conrad |
| BB&T INSURANCE SERVICES, INC., ) | Chief United States District Judge |
| et al., ) | |
| ) | |
| Defendants. ) | |

Dennis and Laurie White (collectively referred to as "the Whites") and their two companies, Cornerstone Custom Homes, LLC ("Cornerstone") and Chores & More Handyman Services, LLC ("Chores & More"), filed this diversity action against BB&T Insurance Services, Inc. ("BB&T") and Farmers Insurance Exchange ("Farmers"), asserting state law claims of negligence, breach of fiduciary duty, and breach of contract. The case is presently before the court on BB&T's motion for summary judgment. For the reasons set forth below, the motion will be granted in part and denied in part.

### Background

The following facts are presented in the light most favorable to the plaintiffs. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

From 1998 to 2008, the Whites owned and operated a number of businesses in Virginia, where Mr. White held a general contractor's license. Cornerstone was formed as a limited liability company in late 1999 or early 2000, and Chores & More was formed as a limited liability company in 2003. The Whites were the companies' sole owners.

Mrs. White was responsible for procuring the companies' insurance, which she accomplished through BB&T.[1] In 2001 or 2002, Mrs. White worked with Barbara Price, a BB&T representative, to obtain insurance for Cornerstone. Chores & More's insurance was procured through BB&T in 2002 or 2003. The insurance included commercial general liability coverage and employee dishonesty coverage.[2]

In 2005, Mike Lucas was hired to work as an estimator for Cornerstone. Six months later, he was promoted to the role of general manager. In that position, Lucas prepared estimates, scheduled crews, purchased materials, and worked with field supervisors. He had authority to enter into contracts on Cornerstone's behalf and to write checks from its account. Lucas was also responsible for overseeing Chores & More's employees, although he was paid solely by Cornerstone.

In September of 2007, the Whites traveled out of the state for several weeks, headed for different destinations. While the Whites were gone, Lucas sent letters to Cornerstone's customers claiming that the Whites had abandoned the company. At the same time, Lucas wrote personal checks out of Cornerstone's checkbooks and instructed customers to give him deposits in his personal name. Lucas also stole the companies' tools, changed the locks on Cornerstone's office, and began doing business as Lucas Custom Homes.

Mr. White returned to Virginia around September 28 or 29, 2007, and Mrs. White returned a day later. Upon their return, the couple discovered that the locks on the doors to

---

[1] The Whites obtained their personal insurance through Farmers.

[2] Neither side has submitted copies of the insurance policies procured by BB&T. However, other evidence in the record indicates that the companies were issued general liability policies by Cincinnati Insurance Company and employee dishonesty bonds by CNA Surety.

Cornerstone's office had been changed. A week later, the Whites learned that tools were missing from their barn. The Whites called the police on both occasions.

On October 17, 2007, other Cornerstone employees who had begun working with Lucas returned two vans that belonged to the Whites. Both vans had been stripped of their tools and other contents. Although the Whites called the police again and provided statements, Lucas was never arrested or charged with a crime.

Mrs. White contacted BB&T on October 17, 2007 and spoke to Barbara Price regarding Lucas's actions. Mrs. White reported that Lucas had "stole[n]" from the companies and that they "need[ed] to put in a claim." (L. White Dep. at 48.) In response, Price purportedly advised Mrs. White that there was "nothing" that could be done, because the companies' general liability insurance had lapsed for non-payment of premiums. (L. White Dep. at 48-49.) Although the companies' insurance coverage included employee dishonesty bonds that might have covered some of the companies' losses, Price did not mention the bonds during her conversation with Mrs. White.

On November 30, 2007, the Whites filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Western District of Virginia. During the bankruptcy proceedings, the Whites indicated that the companies had no assets and that neither the Whites nor the companies had any legal claims against anyone. The bankruptcy court entered an order discharging the Whites on June 23, 2008, and on December 7, 2008, the Whites' Chapter 7 trustee filed a no asset report. The bankruptcy case was closed on August 24, 2009.

In late 2009 or early 2010, after moving from Virginia to Connecticut, the Whites began working with an insurance agent named Patricia Savenella. The Whites assert that they soon

discovered that they had received inaccurate advice from Barbara Price regarding the companies' insurance coverage.

At some point thereafter in 2010, the companies pursued claims under the insurance policies procured by BB&T. All of the claims were denied.

The plaintiffs filed the instant action on October 18, 2010, asserting claims of negligence, breach of fiduciary duty, and breach of contract against BB&T on behalf of the companies. The plaintiffs allege that BB&T "failed in [its] obligation to provide proper professional advice and, relatedly, proper and adequate insurance coverage when Mike Lucas, a former employee of the plaintiffs, stole over $75,000.00 in tools, let numerous bills go past due, defamed the Whites, and usurped corporate opportunities." (Am. Compl. at 1.)

Following the completion of discovery, BB&T moved for summary judgment on the companies' claims. The court held a hearing on the motion on May 4, 2012.

## Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, an award of summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the court must construe the record in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255. To withstand a motion for summary judgment, the non-moving party must offer evidence demonstrating the existence of a genuine issue of material fact for trial. See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the non-moving party's] case.") (internal quotation marks omitted).

4

**Discussion**

In seeking summary judgment on the companies' claims, BB&T makes the following arguments: (1) that the claims should be barred by the doctrine of judicial estoppel, since the Whites failed to disclose the claims during their Chapter 7 bankruptcy proceedings; (2) that the companies lack standing to raise the claims in the instant action because the claims belong to the Whites' bankruptcy estate; and (3) that the companies' claims are barred by the applicable statutes of limitations and are otherwise without merit. The court will address each of these arguments in turn.

I.  **Judicial Estoppel**

As set forth above, the Whites filed for bankruptcy on November 30, 2007. Because the Whites were the only owners of Cornerstone and Chores & More, their ownership interests in the companies became assets of the couple's bankruptcy estate, and the bankruptcy trustee had the authority to take actions on behalf of the companies and administer the companies' assets. See, e.g., Monroe Capital, Inc. v. Frumusa, No. 09-21527, 2010 Bankr. LEXIS 962, at *22 (W.D.N.Y. Apr. 14, 2010). BB&T argues that the companies's claims in the instant action should be barred by the doctrine of judicial estoppel, since the claims were not disclosed during the Whites' bankruptcy proceedings and the Whites instead asserted that the companies had a total value of one dollar.

"Judicial estoppel is a principle developed to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court." Zinkland v. Brown, 478 F.3d 634, 638 (4th Cir. 2007). Before judicial estoppel is applied, three elements must be satisfied:

5

> First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation. The position at issue must be one of fact as opposed to one of law or legal theory. Second, the prior inconsistent position must have been accepted by the court. Lastly, the party against whom judicial estoppel is to be applied must have intentionally misled the court to gain unfair advantage. This bad faith requirement is the determinative factor.

Id. (internal citations and quotation marks omitted). Courts frequently apply the doctrine of judicial estoppel when a plaintiff conceals the existence of a legal claim by omitting it from a bankruptcy petition. Whitten v. Fred's, Inc., 601 F.3d 231, 241 (4th Cir. 2010). As in any other case involving the doctrine, a showing of bad faith is required. See Id. (declining to find that the plaintiff was estopped from pursuing her claim since there was no showing of bad faith); see also De Leon v. Comcar Indus., Inc., 321 F.3d 1289, 1291 (11th Cir. 2003) (holding that judicial estoppel bars a plaintiff from pursuing claims that were not disclosed to the bankruptcy court when "the plaintiff both knew about the undisclosed claims and had a motive to conceal them").

In the instant case, the Whites filed for bankruptcy several weeks after discovering Mike Lucas's alleged misdeeds. However, there is no evidence that the Whites were aware of any potential claims against BB&T during the course of the bankruptcy proceedings. To the contrary, the Whites contend that they did not become aware of any potential claims until 2010, after their bankruptcy case was closed. On this record, the court is simply unable to conclude that the Whites intentionally concealed their claims from the bankruptcy court or that they otherwise acted in bad faith. Accordingly, to the extent BB&T seeks summary judgment on the ground of judicial estoppel, the motion must be denied.

## II. Standing

BB&T alternatively argues that the companies' claims should be dismissed for lack of standing, since the claims accrued before the Whites filed for bankruptcy. As BB&T emphasizes, the property of a bankruptcy estate "includes all of the debtor's interests in any cause of action that has accrued prior to the bankruptcy petition." Miller v. Pac. Shore Funding, 287 B.R. 47, 50 (D. Md. 2002) (citing Tignor v. Parkinson, 729 F.2d 977, 980-81 (4th Cir. 1984)). A legal claim or other property of the debtor "does not escape the bankruptcy estate merely because the debtor is unaware of its existence." Id. Additionally, "[i]f a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim." Nat'l Am. Ins. v. Ruppert Landscaping Co., 187 F.3d 439, 441 (4th Cir. 1999). A claim may be pursued by a debtor only upon a showing that "the claim was exempt from the estate or abandoned by the trustee." Miller, 287 B.R. at 50.

Applying these principles, the court concludes that the companies lack standing to pursue the claims asserted in the instant action. It is undisputed that the claims accrued before the Whites filed for bankruptcy, and, thus, that they are part of the couple's bankruptcy estate.[3] Likewise, there is no indication the claims have been abandoned by the trustee. Rather than dismissing the claims for lack of standing, however, the court agrees with the plaintiffs that it would be more appropriate to afford the Whites the opportunity to ask the bankruptcy court to reopen the bankruptcy case to permit the trustee to determine whether to adopt or abandon any claims that survive BB&T's motion. See Ayazi v. N.Y. City Bd. of Educ., 315 F. App'x 313,

---

[3] The plaintiffs do not challenge this issue and instead "assum[e]" that BB&T is correct in this regard. (Br. in Opp'n at 10.)

7

315 (2d Cir. 2009) (vacating the entry of summary judgment on the basis of standing and remanding with instructions to stay the proceedings to provide plaintiff an opportunity to move to reopen her bankruptcy case). Accordingly, to the extent BB&T seeks dismissal of the claims on the basis of standing, the motion will be denied.

### III. The Merits of the Companies' Claims

Notwithstanding the court's decision on the issue of standing, the court will also consider the merits of the companies' claims. As set forth above, the companies assert claims of breach of contract, negligence, and breach of fiduciary duty against BB&T. Specifically, the companies contend that BB&T breached contractual and fiduciary duties and was negligent in failing to ensure that the companies had adequate insurance coverage. The companies also contend that BB&T breached fiduciary duties and was negligent in providing false and incomplete information to the effect that the companies had no coverage under the insurance policies that were procured by BB&T.

#### A. Breach of Fiduciary Duty

Turning first to the claims for breach of fiduciary duty, the court agrees with BB&T that such claims are time-barred. Under Virginia law, a breach of fiduciary duty claim is subject to the two-year period of limitation set forth in Virginia Code § 8.01-248. See FDIC v. Cocke, 7 F.3d 396, 402 (4th Cir. 1993) (applying the earlier version of § 8.01-248, which contained a one-year time limit); see also Rossmann v. Lazarus, No. 1:08cv316, 2008 U.S. Dist. LEXIS 68408, at *15 (E.D. Va. Sept. 3, 2008). The two-year period begins to run "at the time of the breach," rather than the date on which the breach is discovered. Jones v. Shooshan, No. 1:11cv1148,

8

2012 U.S. Dist. LEXIS 26512, at *23 (E.D. Va. Feb. 29, 2012) (holding, in light of the weight of the existing precedent, that the discovery rule does not apply to breach of fiduciary duty claims); see also Smith v. CNA Fin. Corp., No. 7:01CV00653, 2003 U.S. Dist. LEXIS 28240, at *23-24 (W.D. Va. Nov. 26, 2003) (reviewing cases and rejecting the discovery rule).

In this case, the plaintiffs specifically allege that BB&T breached fiduciary duties owed to the companies by "fail[ing] to provide . . . the broadest protection possible," and by "affirmatively providing false information to the effect that no coverage existed to [the companies] related to the losses caused by Lucas." (Am. Compl. at 10). In light of such allegations, the court agrees with BB&T that the statute of limitations began to run on or before October 17, 2007, when Mrs. White purportedly spoke to Barbara Price regarding Lucas's actions, and was allegedly told that there was "nothing" the Whites could do. (L. White Dep. at 49.) Because the instant action was not filed until three years later, the court agrees with BB&T that the breach of fiduciary duty claims are untimely.

In response to BB&T's motion, the companies argue that BB&T engaged in continued activity which tolled the statute of limitations. Citing a string of emails from August of 2010 regarding the status of the companies' insurance claims, the plaintiffs argue that BB&T was "taking actions" mere months before the plaintiffs filed suit. (Br. in Opp'n at 8.) The court agrees with BB&T, however, that this argument is without merit. The companies' claims against BB&T relate solely to the defendant's alleged failure to procure adequate insurance coverage for losses that occurred in September and October of 2007, and to the defendant's purported misrepresentations in October of 2007 regarding the companies' existing insurance coverage. The companies' claims arising from these separate, independent acts accrued in 2007 and were

9

not tolled by any continued activity on the part of BB&T in 2010.[4] See Harris v. K&K Ins. Agency, Inc., 453 S.E.2d 284, 287 (Va. 1995) (holding that the "continuing undertaking doctrine" does not apply to insurance brokers and, thus, that the broker's continued assistance did not toll the statute of limitations applicable to the plaintiff's claim that the broker breached a contractual duty and was negligent in failing to ensure that the plaintiff had insurance coverage for the loss occasioned by a fire).

For these reasons, the court concludes that the companies' claims for breach of fiduciary duty are barred by the statute of limitations. BB&T's motion for summary judgment will be granted with respect to these claims.

### B. Negligence and Breach of Contract

#### 1. Failure to Procure Adequate Insurance Coverage

The plaintiffs also assert that BB&T breached a contractual duty and was negligent in failing to ensure that the companies had adequate insurance coverage for the losses occasioned by Mike Lucas's actions. As other courts have recognized "[a]n action against an agent or broker for failure to properly procure insurance coverage can generally be brought either as a negligence action or as an action for breach of a contract to procure insurance, and the theory on which the action is brought will ordinarily make little or no practical difference for the purpose of establishing a prima facie case." Stewart v. W. Va. Employers' Mut. Ins. Co., No. 2:07-0168,

---

[4] To the extent the plaintiffs alternatively suggest that the emails give rise to separate and independent claims against BB&T, such argument is also without merit. The companies' amended complaint includes no allegations regarding any improper actions that occurred after 2007, and the plaintiffs have provided no factual explanation or legal authority for their assertion that the emails are probative of any breach or violation by BB&T.

10

2007 U.S. Dist. LEXIS 89377, at *10 (S.D. W.Va. Dec. 5, 2007) (citing cases); see also Prince v. Royal Indem. Co., 541 F.2d 646, 650 (7th Cir. 1976) (noting that "[w]hether the action against the broker sounds in tort based on negligence . . . or in contract for failure to perform the agreement to procure . . . makes little difference"). To prevail on a claim for breach of contract, a plaintiff must establish (1) a legally enforceable obligation by a defendant; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. Filak v. George, 594 S.E.2d 610, 614 (Va. 2004). Similarly, to prevail on a claim of professional negligence, a plaintiff must establish (1) that a relationship giving rise to a duty of care existed between the plaintiff and the defendant; (2) that the defendant breached that duty; and (3) that the breach was a proximate cause of the plaintiff's claimed damages. See Gregory v. Hawkins, 468 S.E.2d 891, 893 (Va. 1996).

  Having reviewed the record and the applicable case law, the court concludes that BB&T is entitled to summary judgment on the claims for failure to procure proper insurance coverage. Even if the court assumes that BB&T had a duty or obligation to provide adequate insurance and that such duty or obligation was breached, the companies have failed to establish that the breach resulted in any injury or damage.

  As BB&T emphasizes in its initial brief, the proper measure of damages for the failure to procure adequate insurance is the amount an insured would have been paid under a policy if adequate insurance had been obtained. See Autumn Ridge, L.P. v. Acordia of Va. Ins. Agency, Inc., 613 S.E.2d 435, 440 (Va. 2005) ("[W]hen the intended insured suffers a loss, the measure of damages for failure to procure insurance is the amount that would have been due under the policy."). Accordingly, it is incumbent on the plaintiffs to prove that an insurance policy was

11

generally available that "would have covered the loss incurred." SMI Owen Steel Co. v. Marsh USA, Inc., 520 F.3d 432, 439 (5th Cir. 2008); see also Metro Allied Ins. Agency, Inc. v. Lin, 304 S.W.3d 830, 836 (Tex. 2009) (holding that the causation standard for a claimed failure to procure insurance under a negligence theory requires "proof that [an] insurance policy would have covered the damages"); Va. Apple Storage, Inc. v. Ins. Ctr. of Winchester, Inc., No. 95-353, 1997 Va. Cir. LEXIS 740, at *28 (Va. Cir. Ct. Apr. 11, 1997) (concluding that the insurer was entitled to judgment on the plaintiff's claims for negligence and breach of contract for failure to procure insurance, where "n[o] evidence was produced to show that such a policy could have been written" which would have provided coverage for the costs at issue); Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc., 739 P.2d 239, 244 (Col. 1987) (emphasizing that when a claim is predicated on the failure of an insurance broker to procure insurance coverage, "it is incumbent upon the plaintiff to prove by a preponderance of the evidence, as an aspect of causation and damages, that such insurance was generally available in the insurance industry when the broker or agent obtained insurance coverage from the plaintiff"); Keddie v. Beneficial Ins., 580 P.2d 955, 956 (Nev. 1978) (holding that there was no basis for liability for failure to procure an insurance policy since "such policy would not have covered the loss incurred").

In the instant case, the plaintiffs have proffered no evidence that insurance existed which would have covered the companies' losses caused by Lucas's actions, other than the policies procured by BB&T. While Mrs. White testified at her deposition that BB&T should have procured "business interruption insurance" (L. White Dep. at 6), the plaintiffs have produced no evidence to establish that this form of insurance would have covered the alleged losses resulting from Lucas's conduct. The only other evidence proffered by the plaintiffs consists of a

12

declaration from Patricia Savenella, the Whites' current insurance agent. While the declaration includes a paragraph listing types of insurance policies that Savenella "expected" the Whites to have based on their "standing in the community," the declaration provides no indication that any of the listed policies would have covered the losses that the companies allegedly suffered at the hands of an employee.[5]

In sum, the plaintiffs have proffered no evidence from which a reasonable jury could find that additional insurance was available that would have covered the companies' losses. In the absence of such evidence, the companies are unable to establish an essential element of their claims for negligence and breach of contract. Accordingly, the court concludes that BB&T is entitled to summary judgment on the claims that it breached a contractual duty and was negligent in failing to insure that the companies had adequate insurance coverage.[6]

### 2. **Failure to provide accurate information regarding the companies' existing insurance coverage**

In their negligence count against BB&T, the plaintiffs also assert that Barbara Price misrepresented, on October 17, 2007, that the companies had no insurance coverage under the policies that were procured by BB&T. According to Laurie White, upon describing Lucas's actions, Price advised her that there was nothing that could be done, because the companies' general liability insurance had expired for non-payment of premiums. Although the companies'

---

[5] BB&T has moved to strike Savenella's declaration on procedural grounds. That motion will be denied.

[6] Having reached this decision, the court need not address BB&T's alternative argument that portions of the claims are time-barred.

insurance coverage included employee dishonesty bonds that might have covered some of the companies' losses, Price did not mention the bonds during her conversation with Mrs. White. The plaintiffs contend that it was not until 2010, presumably when the Whites began working with their new insurance agent, that they learned that the companies could have filed claims under the exiting policies. With respect to the companies' general liability coverage, the plaintiffs discovered that the companies' policies were occurrence-based and, thus, that they provided coverage for losses that occurred during the policy period, even if the policy expired before the claim was filed.

In moving for summary judgment on the merits of this claim, BB&T first argues that the claim is time-barred. As the plaintiffs correctly note in their brief in opposition, however, the companies' claim for professional negligence is governed by Virginia's three-year statute of limitations applicable to oral contracts. See Browning v. Tiger's Eye Benefits Consulting, Inc., 313 F. App'x 656, 664 (4th Cir. 2009) ("Under Virginia law, a claim for professional negligence, although sounding in tort, is considered an action for breach of contract for purposes of the statute of limitations because the legal claim is grounded in contract law."). The claim accrues, and the statute of limitations begins to run, on the date of the "breach." Id. (citing Virginia Code § 8.01-230).

The breach associated with this particular claim of negligence occurred on October 17, 2007, when Price allegedly misrepresented that the companies' insurance had lapsed and that there was nothing the companies could do. Accordingly, the companies had three years, or until Monday, October 18, 2010, to pursue this claim against BB&T. Because the original complaint asserting such claim was filed on that date, the claim is not barred by the statute of limitations.

The court is also unable to conclude, based on the current record, that the claim is otherwise without merit. While BB&T contends that the companies' claims were denied "for reasons that had nothing to do with the delayed reporting," and, thus, that there is "no evidence of damages flowing" from Price's alleged misrepresentations, the evidence is in conflict in this regard. (Br. in Supp. of Summ. J. at 28.) When asked whether any of the insurance claims submitted in 2010 were denied because they were untimely, Mrs. White testified that CNA, the employee dishonesty carrier, "might have . . . said . . . something . . . to the effect that [the claim was filed] three years past the occurrence." (L. White Dep. at 51.) Mrs. White's testimony is supported by an October 29, 2010 letter from CNA, which is the only document in the record regarding the plaintiffs' 2010 claims under the employee dishonesty bonds. That letter provides, in pertinent part, as follows:

> In regard to the bond for Cornerstone Custom Homes, LLC, we note this bond was cancelled as of February 19, 2008. Loss must be discovered while the bond was in force and while it is possible you discovered the loss while the bond was in force, you have not complied with the terms of Section 13, regarding notification of the loss. If you discovered the loss in 2007, you needed to provide us with notice within 15 days of that notice and then provide us with a Proof of Loss within four months of that notice. Please advise why we were not notified back in 2007. <u>We reserve the right to deny coverage due to the late reporting.</u>

(Def.'s Ex. 12) (emphasis added).[7]

Additionally, the plaintiffs have proffered evidence indicating that Cincinnati Insurance, the general liability carrier, paid a claim for stolen tools that was filed by Cornerstone in April of 2007, but denied the claims that were submitted by the companies in 2010. While BB&T argues

---

[7] While other evidence in the record suggests that the employee dishonesty bonds only provide coverage in the event that an employee is convicted of a crime, this particular letter does not expressly communicate such requirement, and the bonds have not been submitted by either side.

that the claims are distinguishable, because the April 2007 claim was for tools that were stolen by a third party, rather than an employee, the defendant has not provided any evidence to support this argument. Indeed, the record is devoid of any written communications from Cincinnati regarding the 2010 claims, and neither the general liability policies nor the employee dishonesty bonds have been submitted by either side.

Based on the current record and in the absence of any other evidence regarding the denial of the companies' claims filed in 2010, the court is unable to conclude that the companies were not harmed by Price's alleged misrepresentations. Consequently, BB&T's motion for summary judgment on this ground must be denied.

The court is likewise unable to conclude, from the current record, that the claim is barred by the doctrine of contributory negligence. Citing the Virginia Supreme Court's decision in General Ins. v. Page, 464 S.E.2d 343 (Va. 1995), BB&T contends that the Whites were contributorily negligent, as a matter of law, because they failed to read the companies' insurance policies until 2010. In Page, an insured sued an insurance broker and its agent, claiming that the agent was negligent in failing to procure adequate insurance coverage against losses the plaintiff sustained as a result of a fire. Id. at 343. On appeal, the Supreme Court held that the plaintiff's failure to read the insurance policy constituted negligence as a matter of law that barred recovery against his insurance agent. Id. at 345. In reaching this decision, however, the Supreme Court emphasized that the coverage limits at issue were clearly stated on the insurance policy: "In the present case, Baker [the insurance agent] handed Page [the insured] the insurance policy that stated plainly on its face that the building was insured for $20,000 . . . ." Id.

16

In the instant case, none of the insurance policies procured by BB&T have been submitted by either side. Without being able to review the applicable policies, the court is unable to conclude, as a matter of law, that this claim is barred by the doctrine of contributory negligence.

## Conclusion

For the reasons stated, BB&T's motion for summary judgment will be granted in part and denied in part. The case will be stayed for sixty (60) days to afford the Whites the opportunity to ask the bankruptcy court to reopen the bankruptcy case to permit the trustee to determine whether to adopt or abandon the remaining claim. At the conclusion of the sixty-day period, it is expected that the Whites will have presented the case to the trustee, and that the trustee will have either sought his substitution as a party in interest, elected to abandon the remaining claim, or requested additional time to review relevant evidence. Absent one of these actions, the remaining claim will be dismissed at the end of the sixty-day period for lack of standing.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record and to Roy V. Creasy, Esq., 213 S. Jefferson St., Suite 915, Roanoke, VA 24011.

ENTER: This 23rd day of July, 2012.

/s/ Glen Conrad
Chief United States District Judge